By the Court.
Woodruff, J.
—The determination- of this appeal depends upon the true construction and- legal effect of the written contract, contained in what is in the form of' a letter from the defendants, dated New York, September 24th, 1852, addressed to the assignor of the plaintiff, and by him assented to by memorandum underwritten.
*342 To the correct interpretation of that letter, it is not only competent but material to take into view the condition of the parties and of the subject of the contract at the time the agreement was made. The circumstances in which the parties were acting may and ought to be considered, and when the true intent and meaning of their agreement admits of any doubt, those circumstances may furnish the key to their true meaning; and it is hardly necessary to add, that when the terms of the agreement, construed by the light thrown upon the subject by the condition and circumstances under which the parties were acting, enable us to determine the true intention of the parties, that must govern.
The plaintiffs in New York were owners of steamships which were on the Pacific coast, running between Panama and California.
On the 14th day of June, 1852, a cargo of coals had been shipped by Mars ton & Power to Panama, and the bill of lading, dated June 1st, 1852, had been indorsed to the assignor of the plaintiffs. The vessel sailed on the first named day (June 14th), and had been more than three months on her voyage.
There is' no evidence that the defendants ever saw the coals, nor reason to believe that they had any knowledge of them until the time when the agreement was made.
The making of the agreement formed no part of the inducement to the sending of the coals to Panama, and their destination was in no wise changed by reason of the making of the agreement ; for the coals had been already more than three months on the voyage, and were within twenty days of their arrival at Panama when the agreement was made.
There is no evidence that'the defendants were dealers in coals beyond the mere fact, that they made the agreement in question; or that they had any knowledge of the various qualities or descriptions of coals, or their fitness for use on board of steamships, unless that is to be inferred from the fact that they owned two steamships then on the Pacific coast.
In that condition of things, the defendants received from the assignor of the plaintiffs the bills of lading of the coals, and agreed to forward them to their correspondents at Panama, stating to them thus “if our engineer on board the W. Scott, or •Cortes” (their steamships) “ approves their quality for use on board *343 'that vessel they are to receive the same we paying,” &c., and “ on learning that the coals are approved of by our engineer, &c., we shall be prepared to pay,” &c. If not so approved, the shipping documents were to be handed to the agents of the plaintiffs’ assignor.
The agreement thus expressed and describing the cargo, simply by its general designation of “coals” was signed by the defendants.
By the language above cited, according to a reasonable and just construction, the parties intended to refer the whole subject' of the fitness of the coals thus bargained for, to answer the-.purposes for which the defendants made the agreement, to their engineer, the defendants evidently declining to use their own judgment at all in the matter. And had the letter constituting the agreement made no further mention of the coals, probably no doubt concerning the correctness of that construction of the .agreement would have been suggested.
But in a memorandum added to the agreement, it is stated among other additional particulars as follows:
“ The coal above referred to is
“200 tons Blackheath, 67-2-t)- do. Wyoming, 1 Pennsylvania.”
Proof being given on the trial that the coal called Blackheath and Wyoming, is known in trade and commerce as hard or anthracite coal; that both kinds are of a uniform degree of hardness; that there is this general character to this coal, and that the coal dealers understand it as well by name as by its use: and it being shown that the coal when it reached Panama was rejected on the mere ground stated in the certificate read on the trial, viz., that “ in my opinion it is not suitable for steamships’ use on this coast, it being too hard to burn without the aid of ■blowers," and that the defendants’ steamships had no blowers; it is thereupon insisted that the coal was improperly rejected; that the defendants had no right to reject the coal because it' was too hard; that the “ quality ” mentioned in the agreement had no reference to the characteristics of the coal generally, but only to its quality or condition as compared with other Blackheath and Wyoming coals, or in reference to its size, or *344 freedom from dirt or slate: and therefore that, if it was in truth of the best quality of Blackheath or Wyoming coals, the defendants . were bound to receive and pay for it, however hard it was, and whether it could be used on board their steamships or not; that if need be, the defendants must fit up their ships with blowers; or at all events they could not reject the coal because they would be compelled to refit their ships■ before they could use the coals.
This is a harsh and, under the circumstances, an unreasonable construction of the agreement.
To give it plausibility even, it has to assume that the defendants, though not coal dealers, must be taken to have such acquaintance with the innumerable varieties of coals as to know that Wyoming and Blackheath coals are hard coals: and at least as hard as coals which the witnesses speak of by the term hard coal.
But recurring to the terms of the contract, it is apparent that quality for use on board their steamships was in the contemplation of the defendants. This in no wise implied that the steamships were to be altered in order to adapt them to the use of the coal, but the contrary. And “ quality ” in this connection imports adaptedness, suitableness, and fitness for the purpose specified, in their most comprehensive sense. Hay, more, the coals were to be approved of in this respect for such use by the defendants’ engineer.
The language of the instrument shows on its face this intent of the defendants; they were willing to purchase such coals as their engineer approved for use on their steamships; they wanted them for no other purpose than to use on those ships; if they were not suited to such use, they had no use for them; they provided that if not so approved, they should be placed at the disposal of the agents of the vendor, who would then carry out the design of the original shipment.
In this there was no hardship as against the vendor. He had not shipped the coal with a view to this agreement, and when the coal was disapproved by the engineer or agent of the defendants, he could and would be at liberty to prosecute, in his own way, the speculation in contemplation of which he originally shipped the coal.
The term “quality” is not necessarily to- be construed in the *345 limited sense claimed for it by the plaintiff, viz., in reference to other coal bearing the same name; that is only a special and restricted meaning of the word; its proper and general meaning applied to a material subject is its “ property,” its “ virtue or particular power of producing certain effects.” It is at least equally consistent with its proper meaning, so far as it involves the idea of comparison with others, to say that it embraces all other coals in the comparison, as it is to confine it to a particular kind.
Besides, the parties here have explained the word itself by reference to the use of the coal contemplated. This undoubtedly is one restriction of the -otherwise general meaning of the term; but it is a restriction fatal to the plaintiffs’ claim; it is quality for use on board the defendants’ vessels; and, as already suggested, that must control.
Indeed, had the agreement been much more foil and explicit in describing the coal, the result must have been the same. Thus, suppose the defendants had said in terms: “We know that the coal is Wyoming coal; we know that Wyoming coal is hard coal; we know that all Wyoming coal is very hard, and of uniform hardness; nevertheless, if our engineer approves their •quality for use on board our steamships, we will receive and pay for them.”
Under the circumstances in which the present agreement was made, and looking at the object which the parties had in view, the defendants must even then have been excused from receiving the coals if the engineer had in good faith pronounced them too hard for such use.
The judgment dismissing the complaint, and the order denying a motion for a new trial, both of which were appealed from, must be affirmed with costs.
Judgment and order appealed from affirmed, with costs.